

U.S. Department of Justice

*United States Attorney*
*District of Maryland*

Paul Riley
Assistant United States Attorney
Paul.Riley@usdoj.gov

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4959
MAIN: 410-209-4800
FAX: 410-962-3091

July 31, 2017

Mr. Joshua Treem, Esq.
Ms. Chelsea Crawford, Esq.
Brown Goldstein & Levy
Baltimore, Maryland 21202

Re:   *United States v. Dylan Thomas Kestel*, CCB-17-00010

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by close of business on August 2, 2017, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

1.  The Defendant agrees to plead guilty to Count Four of the Superseding Indictment charging him with Attempted Enticement of a Minor, in violation of Title 18, United States Code, Section 2422(b). The Defendant admits that he is, in fact, guilty of that offense and will so advise the Court.

### Elements of the Offense

2.  The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

    a.  On the dates listed in the Superseding Indictment, the Defendant used a facility of interstate commerce;

    b.  Knowingly attempted to persuade, induce, entice, or coerce;

    c.  A person whom he believed to be younger than eighteen;

    d.  To engage in any sexual activity for which any person can be charged with a criminal offense.

1

## Penalties

3.      The maximum sentence provided by statute for the offense to which your client is pleading guilty is as follows: imprisonment for not less than ten (10) years and not more than life, followed by a term of supervised release of not less than five years and not more than life and a fine of up to $250,000. In addition, the Defendant must pay $100 as a special assessment pursuant to Title 18, United States Code, Section 3013, and must pay a $5,000 special assessment pursuant to 18 U.S.C. § 3014(a), which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to Title 18, United States Code, Sections 2259, 3663, 3663A, and 3664. If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to Title 18, United States Code, Section 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked—even on the last day of the term—and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

4.      The Defendant understands and agrees that as a consequence of his conviction for the crimes to which he is pleading guilty, he will be required to register as a sex offender in the place where he resides, where he is an employee, and where he is a student, pursuant to the Sex Offender Registration and Notification Act (SORNA), and the laws of the state of his residence. Failure to do so may subject him to new charges pursuant to 18 U.S.C. § 2250.

## Waiver of Rights

5.      The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

   a.   If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

   b.   If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

   c.   If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

      d.      The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

      e.      If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

      f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

      g.      If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

      h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

### Advisory Sentencing Guidelines Apply

6.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at Title 18, United States Code, Sections 3551-3742 (excepting Title 18, United States Code, Sections 3553(b)(1) and 3742(e)) and Title 28, United States Code, Sections 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

7.      This Office and the Defendant understand, agree and stipulate to the following Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt and to the following applicable sentencing guidelines factors:

Count Four (Group One):

a.   **Base Offense Level:** The base offense level is twenty-eight (28) pursuant to U.S.S.G. § 2G1.3(a)(3).

b.   **Use of a Computer:** Pursuant to U.S.S.G. § 2G1.3(b)(3), there is a two (2) level increase because the attempted enticement involved the use of a computer.

c.   **Minor Under Age of 12 Years:** Pursuant to U.S.S.G. § 2G1.3(b)(5), there is an eight (8) level increase because the attempted enticement involved a minor under the age of 12 years.

d.   The adjusted offense level for Count Four (Group One) is 38.

Relevant Conduct (Groups Two – Four)

e.   The plea establishes the commission of additional offenses in the stipulated statement of facts and shall be treated as if the defendant had been convicted of additional count charging those offenses. There are two additional occasions (**Groups Two and Three**) where the Defendant attempted to entice a child using a computer and both are equally serious to the offense charged in Count Four. The adjusted offense level for Groups Two and Three is 38.

f.   The plea also establishes that the Defendant possessed and distributed child pornography. Those offenses group (**Group Four**) and the base offense level is 22 (U.S.S.G. § 2G2.2(a)(2)). The specific offense characteristic increases are as follows: two (2) levels for images of minors under 12 years of age (U.S.S.G. § 2G2.2(b)(2)), two (2) for use of a computer (U.S.S.G. § 2G2.2(b)(6)); and five (5) levels for more than 600 images. (U.S.S.G. § 2G2.2(b)(7)(D)). The adjusted offense level for Group Four is 31.

Multiple Count Rules

g.   Applying the multiple count rules pursuant to U.S.S.G. § 3D1.4, Group One counts as 1 unit; Groups Two and Three as 1 unit each, and Count Four as ½ unit. Therefore, the highest offense level (38) is increased by 4 levels for a total of 42.

8.   This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon your client's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose any adjustment for acceptance of responsibility if your client (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office or the United States Probation Officer; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

9.   Thus, the final anticipated adjusted offense level is 39.

10. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

11. This Office and the Defendant agree that, with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

12. The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct.

### Rule 11(c)(1)(C) Plea

13. The parties stipulate and agree that, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), **a sentence of 168 months' (14 years) imprisonment** in the custody of the Bureau of Prisons is the appropriate disposition of this case. This agreement does not affect the Court's discretion to impose any lawful term of supervised release or fine or to set any lawful conditions of probation or supervised release. In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void. Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea pursuant to the provisions of Federal Rule of Criminal Procedure 11(c)(5). The parties agree that if the Court finds that the defendant engaged in obstructive or unlawful behavior and/or failed to acknowledge personal responsibility as set forth herein, neither the Court nor the government would be bound by the specific sentence or sentencing range contained in this paragraph and the defendant would not be able to withdraw his plea.

### Obligations of the United States Attorney's Office

14. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

15. Government counsel has conferred with the Office of the States Attorney for the Eighth Judicial Circuit of Florida (OSA). If the Defendant pleads guilty in the U.S. District Court for the District of Maryland and is sentenced in accordance with this plea agreement, the Government will ask that the OSA dismiss its pending actions for violation of probation, and the OSA has represented to Government counsel that it will do so.

### Waiver of Appeal

16. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

    a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction.

b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

c. The Defendant further waives any and all motions, defenses, probable cause determinations, objections which Defendant could assert to the Superseding Indictment or to the Court's entry of judgment against the Defendant, imposition of sentence upon the Defendant consistent with this agreement.

d. Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

e. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

## Obstruction or Other Violations of Law

17. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. §3C1.1, (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, (iii) moves to withdraw his guilty plea or (iv) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph. The Defendant acknowledges that he may not withdraw his guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the defendant engaged in obstructive or unlawful behavior and/or failure to acknowledge personal responsibility. In that event, neither the Court nor the government would be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to 11(c)(1)(C).

## Forfeiture

18. The Defendant agrees to forfeit all right, title and interest in the property seized by law enforcement authorities from his residence on September 28, 2016, and further agrees to take

whatever steps are necessary to pass clear title to those properties to the United States, including, but not limited to:

    a. A DELL XPS 410 MODEL COMPUTER, s/n: 3320JC1, containing a 320GB Seagate Barracuda 7200 hard drive, s/n: 9NF0KHBF.

### Collection of Financial Obligations

19. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court.

20. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

21. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

### Entire Agreement

22. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

    Very truly yours,

    Stephen M. Schenning
    Acting United States Attorney

By:  Paul Riley
    Sandra Wilkinson
    Assistant United States Attorneys

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

8/2/17
Date

Dylan Thomas Kestel     8/31/17

I am Mr. Kestel's attorney. I have carefully reviewed every part of this agreement, including the Sealed Supplement, with him. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

8/2/17
Date

Mr. Joshua Treem, Esq.
Ms. Chelsea Crawford, Esq.

### Attachment A

*The undersigned parties hereby stipulate and agree that the following facts are true and accurate, and that if this matter had gone to trial, the government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter gone to trial.*

Dylan Thomas Kestel ("Kestel"), age 25, is a resident of Sykesville, Maryland. During the summer of 2016, Kestel, by means of an Internet-based text messaging application called Kik, attempted to arrange sexual encounters between himself and a 10-year-old child, a six-year-old child, and a nine-year-old child. Kestel did so while on probation for a January 2, 2013 conviction for traveling to meet a person whom he believed to be a 12-year-old girl for the purpose of engaging in oral and/or vaginal and/or anal intercourse.

The Florida conviction arose out of July 21, 2012 arrest in connection with text message and phone conversations he initiated with an undercover officer (UC) on July 19, 2012 after responding to a classified ad on a website. The exchanges with the purported child and the purported child's stepfather included discussion of oral, anal, and vaginal intercourse with the purported child, among other things.

In or about May 2016, while on probation for the Florida conviction, Kestel used Kik to communicate with at least one fourteen-year-old minor—who represented herself to be in her early twenties.

Furthermore, during the summer of 2016, Kestel engaged in online chats with three separate undercover officers, each of whom had posted an online bulletin message on a website that was intended to attract individuals with a sexual interest in children. The Internet is a facility of interstate commerce.

### UC#1

On June 13, 2016, Kestel and an undercover officer (UC#1) who was posing as father of a 10-year-old minor began an online chat on Kik. Kestel indicated that he was into "all" ages, and inquired as to how old UC#1's purported daughter was. UC#1 stated "10." Kestel asked, "has she done any play b4" and requested some "fun pics" of her. UC#1 replied "[o]f course. I don't like sending too many out without getting something in return."

In response, Kestel sent UC#1 an image of a pre-pubescent female child performing oral sex on an adult male. Thereafter, Kestel asked several questions pertaining to UC#1's purported 10-year-old daughter, such as whether she "orgasm[s]," how "she taste[s]," and "does she swallow."

On June 14, 2016, Kestel sent UC#1 seven additional images depicting child pornography and child erotica, as well as a Drop Box link that contained 30 videos, of which at least a third were videos depicting minors engaged in sexually explicit conduct.

1

On June 19, 2016, Kestel asked when UC#1 would be getting UC#1's purported 10-year-old daughter. UC#1 told him that it would not be for another week. Kestel also asked UC#1 whether he "would ever do a gangbang with your daughter? lol" and stated that he "know[s] a couple others into yng so maybe eventually."

On June 24, 2016, Kestel asked UC#1 if Kestel could meet the child half way between his residence in Maryland and Washington, D.C. When UC#1 refused to meet in the middle, Kestel responded that UC#1 should be "more compromising with the meeting." On June 25, 2016, Kestel suggested that he and the purported child meet at a "private area[] for swimming." When UC#1 refused, Kestel asked UC#1 to "send me a vid of you and her playing before we meet."

UC#2 (Count 4)

On June 6, 2016, Kestel began to communicate with a second UC (UC#2) who was posing as a mother with "access" to a six-year-old child. On June 9, 2016, Kestel inquired about UC#2 having "a child who needs a daddy figure," and engaged in conversation with UC#2 about "teaching" the child how to perform sexual acts. UC#2 told Kestel that her purported child was "[a]lmost 7" and asked "is that too yng?" Kestel replied "no."

On June 13, 2016, Kestel explained to UC#2 the approach he planned to take in the sexual encounter with the child and told UC#2 about prior sexual experiences with children aged 6, 8 and 14. He further stated that his age preference is "3 or 4, want to try 12 or 14 again too, when breasts are just puffing up." On June 14, 2016, Kestel suggested that he could meet the child at a "secluded place to swim" or in a car.

On June 16, 2016 through June 28, 2016, Kestel continued to attempt to arrange a meeting between himself and the purported child and on June 28, 2016, Kestel agreed to meet UC#2 and the child at a Starbucks in Washington DC on June 30, 2016 around 10 a.m. The meeting did not take place, however, because Kestel asked UC#2 to send him a picture "that proves you are into what you say you are," but UC#2 did not do so.

UC#3

On July 6, 2016, Kestel engaged a third UC (UC#3) on Kik who was posing as the father of a nine-year-old child. Kestel, among other things, stated to UC#3 that he had "played" with a nine-year-old in the past and that he was into children ages "6-13." On July 7, 2016, Kestel attempted to arrange a meeting with UC#3's purported daughter but explained that he "wouldn't meet in person till I knew you were real about this. last person had the same idea but she refused to show any indication b4 meeting that she was real about taboo."

Kestel thus asked UC#3 to send him a picture of "naughty young." In response, UC#3 sent a picture of his purported daughter, but Kestel complained that the picture that was sent was "not really naughty" and that he "mean[s] something like or fingering or spreading." When UC#3 was unable to provide these images to Kestel, Kestel replied, "even if I were a pic collector, I wouldn't need you for that. I know a guy that sends me 3 or 4 pics a day. ive got plenty."

Kestel's Computer

On September 28, 2016, FBI investigators executed a search warrant at Kestel's residence at 2406 Haight Avenue, Sykesville, Maryland 21784. Agents recovered a desktop computer used by Kestel in the basement area of the house. The only other residents at Kestel's residence besides Kestel were his mother and father, both of whom denied using the desktop computer to distribute, receive, or possess child pornography.

An FBI certified forensic examiner examined Kestel's computer. Among other things, the examiner found:

(1) a portion of the Kik chat between Kestel and UC#3;

(2) certain of the images of minors engaged in sexually explicit conduct that Kestel distributed to UC#1 on June 13 and June 14, 2016;

(3) positive results for string searches for the Drop Box link Kestel sent to UC#1;

(4) 28 image files depicting minors engaged in sexually explicit conduct;

(5) various search terms indicative of child pornography and the use of Kik, including: "juvenile porn," "cute little sluts," "porn teen," "kik teens," and "how to log out of kik;" and

(6) the application Slim Cleaner Plus—a tool used to delete, among other things, files, programs, logs, and Internet history.

\*\*\*

I have reviewed the foregoing statement of facts with my attorney, understand it, agree with it, and do not wish to change any part of it. I further understand that it is included as part of my plea agreement with the government in this case.

*Dylan T Kestel*
Dylan Thomas Kestel

I am Mr. Kestel's attorney. I have carefully reviewed the statement of facts with him.

*Chelsea J Crawford*
Joshua Treem, Esq.
Chelsea Crawford, Esq.
Counsel for Dylan Thomas Kestel

3